IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL DANIELS,                          )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )     Civil Action No.  04-1427
                                          )
JO ANNE B. BARNHART,                      )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )
                    Defendant.            )

MEMORANDUM ORDER

CONTI, District Judge

*Introduction*

Pending before the court is an appeal from the final decision of the Commissioner of

Social Security ("Commissioner" or "defendant") denying the claim of Michael Daniels

("plaintiff") for Supplemental Social Security ("SSI") under Title XVI of the Social Security Act

("SSA"), 42 U.S.C. §§ 1381, *et seq.*  Plaintiff contends that the decision of the administrative law

judge (the "ALJ") that he is not disabled, and therefore not entitled to benefits, should be

reversed because the decision is not supported by substantial evidence and that the case should be

remanded for the ALJ to consider properly all the evidence as presented.  Defendant asserts that

the decision of the ALJ is supported by substantial evidence.  The parties filed cross-motions for

summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  The court

will deny plaintiff's motion and grant defendant's motion because the decision of the ALJ is

1

supported by substantial evidence.

### *Procedural History*

Plaintiff filed the application at issue in this appeal on a protective basis on November 22, 2002, asserting a disability since February 1, 1989[1] by reason of depression, anxiety, prostate problems and neck problems.[2]  (R. at 421-29.)  He was denied at the initial level (R. at 381-84) and then filed a request for a hearing.  (R. at 385.)  On February 10, 2004 a hearing was held before the ALJ.  Plaintiff appeared at the hearing and testified.  (R. at 128-52.)  Plaintiff was represented by an attorney at the hearing (R. at 128.)   In a decision dated April 22, 2004, the ALJ determined that plaintiff was not disabled and, therefore, not entitled to benefits.  (R. at 14-29.)  Plaintiff timely requested a review of that determination and by letter dated August 6, 2004 the Appeals Council denied the request for review.  (R. at 8-10.)  Plaintiff subsequently commenced the present action seeking judicial review.

It is noteworthy that plaintiff has three previously adjudicated applications.  (R. at 17.)  Plaintiff's prior applications for disability were denied on March 11, 1997, on January 10, 2000, and most recently on September 12, 2002.  Id.   The ALJ found no reason to disturb the prior

---

[1]The ALJ's decision adjudicates the period from September 13, 2002 through April 22, 2004.

[2]The ALJ in his decision denying benefits and the plaintiff in his brief in support of summary judgment both  identify "depression, anxiety, prostrate problems *and neck problems*" as the basis for plaintiff's application for SSI, and both cite Exhibit D2E in support (Plaintiff's Disability Report Adult dated December 10, 2002) (emphasis added).  (R. at 420-29.)  Plaintiff's disability report of December 10, 2002, however, identifies "depression", "bipolar", and "prostatitis" as the illnesses, injuries or conditions that limit plaintiff's ability to work, and does not mention neck problems on its face.  (R. at 420-29.)  There is evidence elsewhere in the record, however, referencing, inter alia, neck and back pain.

decisions and dismissed the period from February 1, 1989 through September 12, 2002 on *res judicata* grounds.  Id.  The court notes that Social Security regulations provide that upon a finding of good cause, an administrative law judge may reopen a determination if the application is filed more than twelve months after but within four years of the date of the initial determination.  Smith v. Barnhart, 2005 WL 589758 at *3 (E.D.Pa. 2005) (citing 20 C.F.R. §§ 404.988; 416.1488).  The administrative law judge will find that good cause exists if new and material evidence is furnished.  Id. (citing 20 C.F.R. §§ 404.988-989; 416.1488-1489).  Absent a colorable constitutional claim or a *de facto* reopening, a refusal to reopen prior determinations is not a final decision subject to judicial review.  Id.  (citing Califano v. Sanders, 430 U.S. 99, 107-09 (1977) (constitutional claim); Brown v. Sullivan, 912 F.2d 1194 , 1196 (10th Cir. 1990) (*de facto* reopening); Taylor for Peck v. Heckler, 738 F.2d 1112, 1115 (10 Cir. 1984) (*de facto* reopening)).

There are two ways a case can be reopened.  Girard v. Chater, 918 F.Supp. 42, 44-45 (D.R.I. 1996).  The administrative law judge may make an express determination to reopen a case or the administrative law judge may "constructively" reopen the case by reconsidering the prior claim on its merits.  Id. (citations omitted).  Merely considering evidence from past adjudications, however, does not constructively reopen prior claims.

> A prior disability claim is not deemed to have been reconsidered on the merits merely because the evidence reviewed by the ALJ included evidence of the claimant's condition at the time of the previous application.  An ALJ "is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application."

Id.  (quoting Frustaglia v. Sec'y of Health & Human Serv., 829 F.2d 192, 193 (1st Cir. 1987)).

3

Indeed, an administrative law judge is required to consider all evidence available in an individual's record.  Id.  Where an administrative law judge expressly refuses to reopen earlier claims, and considers a claimant's physical condition at the time of previous applications in the context of determining whether the claimant is disabled for the purposes of the pending application, the administrative law judge is not reopening the claim.

Here, the ALJ appropriately considered evidence of plaintiff's condition at the time of previous applications in order to analyze whether plaintiff was disabled during the applicable period.  (R. at 17-29.)  Accordingly, and because plaintiff does not challenge the ALJ's decision with respect to the finality of prior decisions, the court undertakes no analysis of the earlier claims on the merits.  The court, however, as did the ALJ, will consider background medical evidence from the earlier proceedings where that evidence is of record and relevant in this subsequent proceeding.  Fernandez v. Commissioner, 2004 WL 2743583 at *1 (E.D.Pa. 2004); Girard v. Chater, 918 F.Supp. 42, 44-45 (D.R.I. 1996).

### Legal Standard

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits.  42 U.S.C. § 405(g).  This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner.  42 U.S.C. § 405(g).  "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate.'"  Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir. 1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)).  This deferential standard has been

referred to as "less than a preponderance of evidence but more than a scintilla." <u>Burns v. Burnhart</u>, 312 F. 3d 113, 118 (3d Cir. 2002).  This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder.  <u>Id.</u>; <u>Fargnoli v. Massonari</u>, 247 F.3d 34, 38 (3d Cir. 2001)(reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry).

### *Plaintiff's Background and Medical Evidence*

Plaintiff was 47 years old at the time of the hearing before the ALJ.  (R. at 128.)  He resided with his wife and then four-year-old daughter.  (R. at 130.)  He completed eleventh grade and received a GED.  (R. at 81,128.)   Plaintiff has no subsequent education other than some vocational training as an electrician which plaintiff never finished or used.  (R. at 82.)  He has past work experience as a cab driver in 1988 or 1989 and since then worked for a brief one-month or two-month stint driving for pizza delivery.  (R. at 82-83; 128-30.)  Before 1988 or 1989, he worked for a cleaning company and as a gas station attendant and grocery store clerk.  (R. at 83-85.)  The ALJ found that plaintiff had no past relevant work.  (R. at 28.)

Plaintiff's medical records show that plaintiff received treatment for prostatitis, dysthymia, adjustment disorder of adult life with depressed mood, alternatively described in his medical records as depression, chronic back and neck pain, and spondylosis (spinal osteoarthritis), or disc disease in the lumbar and cervical spine.   The medical evidence of record shows that plaintiff has been treated since 1989 for prostate problems.  (R. at 435).  Plaintiff  was diagnosed September 1990 after a biopsy with benign prostatic hypertrophy, also referred to as

"prostatic nodules." (R. at 626, 632-33.) He was ultimately diagnosed with chronic[3] non-

specific[4] prostatitis, an inflammation of the prostate gland whose cause is uncertain or unknown.[5]

(R. at 363-74; 601-24.) Plaintiff's condition was described at least once as "chronic *abacterial*

prostatitis" (R. at 606) (emphasis added) and several times as "chronic prostatitis." (see e.g., R. at

613, 615.) Over several years of treatment for his prostatitis, plaintiff complained to his

urologists of, inter alia, painful or difficult urination (dysuria), difficulty emptying his bladder

(difficulty "voiding"), increased urgency and frequency of urination, burning sensations and

---

[3]"Chronic" is defined as "(1) of long duration; (2) denoting a disease showing little change or of slow progression; the opposite of acute." Taber's Cyclopedic Medical Dictionary at 415 (20th ed. 2005).

[4]"Non-specific" is defined as "(1) inexact, imprecise, not well delimited or defined; (2) vague; (3) poorly identified, described without certainty." Taber's Cyclopedic Medical Dictionary at 1478 (20th ed. 2005).

[5]"Prostatitis" is defined as "[i]nflammation of the prostate gland, usually as a result of infection." Taber's Cyclopedic Medical Dictionary at 1790 (20th ed. 2005). "Acute bacterial prostatitis" is inflammation of the prostate commonly associated with urinary tract infections caused by bacteria which is often caused by reflux of urine resulting from an anatomical abnormality. Id. Patients with acute bacterial prostatitis usually present with fever, chills, urethral discharge, pain on urination, difficulty voiding, malaise, myalgias, and discomfort in the perineal area, and the prostate is soft, swollen and tender on examination. Id. With acute bacterial prostatitis, the causation organism is identified through culture of prostatic secretions and treated with an extended course of antibiotics and with narcotics and antispasmodics to relieve pain. "Chronic abacterial prostatitis" is "inflammation of the prostate gland marked by dull, aching pain in the perineum, usually of long duration." Id. Although it is the most common type of chronic prostatitis, its cause is unknown. Id. "Chronic bacterial prostatitis" is "inflammation of the prostate caused by a long-standing bacterial infection that often develops insidiously;" its causative organisms include various bacteria. Id. Patients with chronic bacterial prostatitis present with mild to moderate low back pain, pain with urination, and perineal discomfort, or may be asymptomatic. Id. Patients with chronic bacterial prostatitis may have a history of multiple urinary tract infections; bacteria can hide in the prostate, which resists penetration by antibiotics, and reinfect the urinary tract. Id. Treatment consists of ciprofloxacin or another fluoroquinolone antibiotic for four to six weeks. Id. The long course of antibiotics is needed because of poor penetration into the prostate. Id.

pressure during urination, blood in urine (hematuria), difficulty with and burning during ejaculation, groin pain, rectal pain, lower back pain, and constipation. (R. at 363-74; 601-24). Plaintiff complained at times of constant pain and constant urgency to void. (R. at 364). In addition, plaintiff's medical records from his primary care physicians indicate prostatitis and lower back and groin pain. (R. at 236-50). Further, plaintiff's psychological records indicate repeated complaints about plaintiff's prostate and related problems. (see, e.g., R. at 258, 260). Plaintiff testified before the ALJ that after he was diagnosed he "had to start running to the bathroom all the time" and "whether [he] had to go or not, [he] felt like [he]'d have to go." (R. at 131). Plaintiff testified that during the course of the day he generally needed to go the bathroom twenty times a day or more, at times as frequently as five trips to the bathroom in a half hour. (R. at 139). Plaintiff testified that he experienced pain that was at times "excruciating," and that depending on how his prostate was swollen on a given day, he sometimes could not sit for any length of time at all. (R. at 132-34). In addition, plaintiff testified that the urge to urinate disturbed his sleep. (R. at 138).

In addition to his prostate problems, plaintiff has received treatment for neck, back, and headache pain connected with his degenerative disc disease, cervical spondylosis[6] and spinal stenosis.[7] (R. at 548-53; 578; 580; 588-90; 636). Plaintiff has also received treatment for

---

[6]"Cervical spondylosis" is defined as "degenerative arthritis, osteoarthritis, of the cervical or lumbar vertebrae and related tissues . . . . may cause pressure on nerve roots with subsequent pain or paresthesia in the extremities." Taber's Cyclopedic Medical Dictionary at 2054-55 (20th ed. 2005).

[7]"Stenosis" is defined as "the constriction or narrowing of a passage or orifice." Taber's Cyclopedic Medical Dictionary at 2069 (20th ed. 2005). "Lumbar spinal stenosis" is defined as "a narrowing of the spinal canal caused by degernative or traumatic changes at the level of the lumba vertebrae. . . . causes back pain, often associated with pain that radiates into the legs, esp.

dysthymia[8] (also referred to as dysthymic disorder) (R. at 443-49; 452-72, 478-511, 526-47);[9] adjustment disorder[10] of adult life with depressed mood (R. at 452-55; 478-511; 526-47); and plaintiff was involuntarily committed pursuant to a 302 petition on one occasion from September 10-14, 2002 due to a suicide attempt after his wife and child temporarily left him.  (R. at 450-72).

### *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(B).

---

when the patient is standing. . . . sitting often relieves the pain. . . ." Id. at 2070.

[8]"Dysthymia" or "dysthymic disorder" is defined as "a chronically depressed mood that is present more than 50% of the time for at least 2 years in adults. . . ." Taber's Cyclopedic Medical Dictionary at 653 (20th ed. 2005).

[9]There are some indications in plaintiff's medical records that plaintiff is "depressed."

[10]"Adjustment disorder" is defined as  "a maladaptive reaction to an identifiable psychological or social stress that occurs within 3 months of the onset of the stressful situation. . . . the reaction is characterized by impaired function or symptoms in excess of what would be considered normal for the stress. . . . " Taber's Cyclopedic Medical Dictionary at 46 (20th ed. 2005).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. § 416.920. The evaluation consists of the following stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled. Burns v. Burnhart, 312 F.3d at 119. The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. Id.

In the instant case, the ALJ found: (1) plaintiff has not engaged in substantial gainful activity since the alleged onset of disability on February 1, 1989; (2) plaintiff suffers from disc disease in the lumbar and cervical spine with evidence of neural foraminal encroachment in the cervical spine; adjustment disorder of adult life with depressed mood, dysthymic disorder, and prostatitis, which are severe; (3) these impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff has no past relevant work; and (5) there were jobs in the national economy that plaintiff could perform. (R. at 28.)

Plaintiff raises two broad arguments. First, plaintiff argues that the ALJ erred by failing to give proper consideration to plaintiff's physical limitations, and in particular his need for

9

frequent bathroom breaks, due to his prostatitis.  Specifically, plaintiff argues that the ALJ erred

in finding plaintiff's  medically documented limitations as a result of his prostatitis to be "not

demonstrated" or not credible; that the ALJ failed to give sufficient weight to plaintiff's

testimony regarding the subjective pain resulting from his prostatitis; and that the ALJ erred in

relying on the vocational expert's testimony based upon a hypothetical that did not include

demonstrated limitations, such as the need for frequent bathroom breaks, in lieu of the

hypothetical that did.  Second, plaintiff argues that the ALJ erred by failing to give proper

consideration to plaintiff's limitations as a result of his adjustment disorder and dysthymic

disorder.  Specifically, plaintiff argues that medical evidence demonstrates that plaintiff has poor

or no ability to deal with work stress, function independently, or demonstrate reliability; and that

the vocational expert testified that an individual has to stay on task and function independently at

least eighty-five to ninety percent of the workday to sustain employment.  Therefore, plaintiff

argues that plaintiff does not have the residual functional capacity to perform an eight-hour work

day.  The court addresses each of these issues in turn.

*I. Whether the ALJ Erroneously Evaluated Plaintiff's Limitations as a Result of Prostatitis to be "Not Demonstrated" or Not Credible*

Plaintiff argues that the ALJ erred in finding plaintiff's  medically documented

limitations as a result of his prostatitis to be "not demonstrated" or not credible.  The ALJ found

that while the evidence supports finding that plaintiff has a prostate impairment, the clinical

findings, diagnosis and treatment do not demonstrate a prostrate impairment of the severity

alleged by plaintiff.  (R. at 22).  The ALJ found significant that "there is no substantial and

ongoing treatment in the current period for the condition."  Id.   Further, the ALJ found

plaintiff's prostate problems less credible by reason of plaintiff taking no medication for the problem at the time of the hearing.  (R. at 24) ("The claimant states that his prostate swells and causes urination problems and pain, yet he takes no medication for this condition.  Per the claimant, nothing had helped, but the medical record reveals large gaps of time with regard to lack of any treatment or follow-up, which indicates that the problem is not as difficult and the symptoms not as persistent as the claimant suggests even though the claimant took a bathroom break during [the] process of the 45 minutes of the hearing.")  The ALJ, however, failed to consider that plaintiff was not on medication other than pain medication and ibuprofen at the time of the hearing in the context of the significant medical evidence of record showing that plaintiff has taken, albeit unsuccessfully, several regimes of medication for his prostatitis without relief.[11]

For example, since his diagnosis with prostate problems in 1989, the medical evidence of record shows that plaintiff's urologists prescribed Pyridium® (phenazopyridine hydrochloride), a urinary tract analgesic (R. at 370, 624.); tetracycline, an antibiotic used to treat bacterial infections (R. at 370, 624.); Bactrim DS® (sulfamethoxazole and trimethoprim), used to treat urinary tract infections (R. at 365-66, 368, 370, 624.); Floxin® (ofloxacin), an antibiotic used to treat urinary tract and prostate infections (R. at 372, 373, 620.); Hytrin® (terazosin), an alpha-blocker used to treat the symptoms of enlarged prostate (R. at 365, 618.); and Ditropan® (oxybutynin chloride), used to treat overactive bladder and urinary incontinence, urgency and frequency (R. at 373.).  In addition, his urologists recommended Motrin® (ibuprofen) and sitz

---

[11] In addition, plaintiff takes anti-depressants Prozac® and Serzone®, has taken Buspar® for anti-anxiety, and takes Neurontin®, ibuprofen, and tylenol for pain.

baths to relieve plaintiff's symptoms  (R. at 374, 622).  Further, his primary care doctors

prescribed plaintiff Cipro® (ciprofloxacin hydrochloride) (R. at 560.) and Levaquin®

(levofloxacin) (R. at 589.), broadrange antibiotics used for difficult to treat bacteria, in response

to plaintiff's prostrate pain.

 The medical evidence of record demonstrates that none of these medicines provided

plaintiff significant or lasting relief.  For example, handwritten notes indicate that plaintiff took

Hytrin "/s any relief," or "without any relief" (R. at 367.); that "meds: Ø" or "medications have

no effect" (R. at 373.); and that "tetracycline – no Δ" or "tetracycline [lead to] no change" (R. at

624).  In addition, handwritten notes of a report of contact on June 17, 2003 with Dr. Michael

Chancellor, one of plaintiff's treating urologists at the University of Pittsburgh, indicates that

while UPMC Urological Associates started treating plaintiff in 1989 and last saw him in 2001,

"there is nothing else he can do," "just come for checkups once a year," and that the physician

"wants to do another prostate biopsy."  (R. at 435).  This statement corroborates plaintiff's own

statements that he exhausted medical treatments for his prostatitis other than basic pain relief

prior to the year immediately before his hearing before the ALJ.  For example, in a letter to Dr.

Hugh Flood, one of plaintiff's treating urologists at the University of Pittsburgh, plaintiff wrote:

"I realize that we had tried all known medications helpful to my problem without any success,

but, is there any new medications [sic] that won't interfere with my other medication - which is

Prozac?" (R. at 510).  The Commissioner argues that the longitudinal evidence of record does not

support plaintiff's symptomatic claims and that plaintiff did not take medication for his prostate

condition.  This observation, however, is contradicted by the medical evidence of record. While

the ALJ could have considered in more contextual detail the fact that plaintiff was not on

medication specifically for his prostatitis at the time of the hearing, and specifically that plaintiff

has taken, albeit unsuccessfully, several regimes of medication for his prostatitis without relief,

other evidence in the record supports the ALJ's findings concerning plaintiff's limitations.

The ALJ found that while the evidence supported a finding that plaintiff has a prostate

impairment, the clinical findings, diagnosis and treatment did not demonstrate a prostrate

impairment of the severity alleged by the plaintiff.  (R. at 22).  Under applicable precedent, an

administrative law judge should not render a medical opinion.  See  Kent v. Schweiker, 710 F.2d

110, 115 (3d Cir. 1983) (an administrative law judge's medical judgment cannot stand because

"these kinds of judgments are not within the ambit of the ALJ's expertise"); Fowler v. Califano,

596 F.2d 600, 602 (3d Cir. 1979) ("[A]n ALJ is not free to set his own expertise against that of

physicians who present competent medical evidence."); Schaaf v. Matthews, 574 F.2d 157 (3d

Cir. 1978) (improper for an administrative law judge to engage in "medical diagnosis of his

own").  Rather, an administrative law judge has an affirmative duty to develop the record.  Lilly

v. Barnhart, 2004 WL 875545, *4 (E.D.Pa.,2004) (citing Sims v. Apfel, 120 S.Ct. 2080 (2000);

Plummer v. Apfel, 186 F.3d 422 (3d Cir.1999); Ventura v. Shalala, 55 F.3d 900 (3d Cir.1995)).

If there is contradictory medical evidence in the record, an administrative law judge may reject

probative evidence, but must explain the basis for her decision.  If an administrative law judge

believes that the medical evidence is unclear with respect to whether a claimant is suffering from

a condition with symptoms as severe as were alleged, an administrative law judge should

consider securing additional evidence.  See Kent v. Schweiker, 710 F.2d 110, 114-15 (3d Cir.

1983).   A consultive exam may be advisable to clarify any discrepancy.  See 20 C.F.R. §§

404.1517;  404.1519(a), (b); 416.916(a), (b);  416.917.

Here, a consultative medical exam was requested, but plaintiff failed to attend. (R. at 19, 146-47, 385.) In his request for a hearing plaintiff explained his failure to attend as follows: "I did not attend the exam that was scheduled because I was taking care of my sick parents and cannot remember what happened at the time. I could have been sick also." (R. at 385.) The ALJ questioned plaintiff about his failure to attend the examination at the hearing and plaintiff elaborated on the situation of his parents' health. (R. at 146-47.) The plaintiff, however, could not remember the exact details or duration of their treatment. Id. Though he testified that he played a role checking on them and keeping an eye on their home while they were ill, upon questioning from the ALJ whether he did yard work for them, he testified that an uncle took care of yard work. Id.

Failing to appear at a consultative examination can be considered as evidence that supports a finding that a plaintiff is not disabled. 20 C.F.R. § 404.1518(a) provides:

> If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability or blindness, we may find that you are not disabled or blind. If you are already receiving benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arranged for you, we may determine that your disability or blindness has stopped because of your failure or refusal. Therefore, if you have any reason why you cannot go for the scheduled appointment, you should tell us about this as soon as possible before the examination date. If you have a good reason, we will schedule another examination. . . .

C.F.R. § 404.1518(b) gives examples of good reasons for failure to appear, including, inter alia, illness on the date of the scheduled examination, not receiving timely notice of the examination, being furnished incorrect or incomplete information about the time or place of the examination, and having had death or serious illness occur in one's immediate family. Id. An ALJ, therefore,

can consider failure to appear for a consultative examination as evidence in support of a finding that a claimant is not disabled.  See also Purter v. Heckler, 771 F.2d 682, 688 (3d Cir. 1985) (noting an administrative law judge's denial of disability benefits based upon failure to attend consultative exams; reversing and remanding district court's upholding of the administrative law judge's denial of disability benefits on other grounds).  Here, while plaintiff indicated that he missed his consultative exam both due to illness in his immediate family and due to a vague reference that he may have been ill, substantial evidence supports finding these reasons not entirely credible.  For example, there is no evidence in the record showing that plaintiff made any effort to notify anyone why he could not go to the scheduled appointment.  Nor is there any evidence in the record showing that plaintiff made an effort to reschedule the appointment.  20 C.F.R. § 404.1518(a) requires claimants to notify the Social Security Administration concerning any good reasons they have to miss a consultative examination as soon as possible before the examination date.  Id.  If claimants have a good reason, the Social Security Administration will schedule another examination.  Id.  Where as here plaintiff failed to attend the examination, and failed to make any attempts to reschedule it, the failure to attend can be considered evidence against plaintiff's claim of disability.

In addition to the above, the ALJ appropriately considered that plaintiff sought no treatment specifically for his prostrate condition during the applicable period.  (R. at 22.)  Failure to seek treatment during the relevant time period can be considered as evidence of disability or credibility.  See, e.g., Kuhn v. Barnhart, 2004 WL 414069, *2 (E.D.Pa.,2004).  Failure to seek treatment, however, is not conclusive evidence of lack of a medical problem.  See Eberhart v. Massanari,172 F.Supp.2d 589, 596 (M.D.Pa.,2001) (determining that the plaintiff's failure to

15

seek certain treatments did not discredit her testimony when there were other reasons not to seek them).

Although plaintiff was only going for follow-up checkups for his prostate problem infrequently in the years leading up to the hearing, some evidence of record indicates that this may have been reasonable in light of plaintiff's medical history.  For example, by this stage, plaintiff's urologist reported that plaintiff was required to come in for yearly check-ups.  (R. at 435).  Further, the medical evidence of record demonstrated that plaintiff had exhausted several medicinal therapies for his condition by this stage.  See also Anderson v. Barnhart, 2003 WL 22047389 (N.D.Iowa,2003).  "It is true that, '[w]hile not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.'" Id. at *22 (N.D.Iowa 2003) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).   Further, "[a] claimant's failure to seek medical treatment may undercut allegations of disabling pain."  Id.  If a plaintiff, however, is unable to follow a prescribed regimen of medication and therapy to combat disabilities for some reason, that reason may be taken into consideration when determining whether to award benefits.  Id. (taking financial hardship into account).

Here, there is contradictory evidence concerning the severity of plaintiff's symptoms during the applicable time period.  It would have been desirable for the ALJ to question plaintiff more directly regarding the gap in his treatment.  During the hearing, plaintiff testified that his urologist was "shooting in the dark trying to find some kind of broadband medication that might treat whatever it is that causes my prostate to do what it is [sic] does" and that his condition was "non-specific" and that they didn't know what caused it or how to treat it.  (R. at 142).  In addition, upon questioning from the ALJ, plaintiff testified that he had tried all the usual

medications and they were not helping.  Id.  Further, SSR 96-7p is applicable here in plaintiff's

favor.  SSR 96-7p provides in pertinent part:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative hearing in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.

SSR 96-7p.  See also Sims v. Apfel, 530 U.S. 103, 111 (2000) (noting that Social Security

proceedings are inquisitorial rather than adversarial and it is the administrative law judge's duty

to investigate the facts and develop the arguments both for and against granting benefits).  While

more direct questioning may have further developed the record for review on this point,

substantial evidence supports the ALJ's resolution of the conflicting evidence of record and

plaintiff's testimony.

For example, plaintiff's failure to take medication or seek treatment specifically for his

prostate goes back several years.  In addition, plaintiff's failure to seek follow-up treatment with

a gasteroenterologist at the suggestion of his treating urologist was noteworthy evidence against a

finding of limitations to the extent alleged by plaintiff.  (R. at 444).  Plaintiff offered no

explanation for failing to pursue this route.  A prior decision by an administrative law judge also

found plaintiff's allegations not totally persuasive.  (R. at 49).  In light of the totality of the

record, substantial evidence supports the ALJ's finding that plaintiff's allegations of pain and

limitations are not totally persuasive.  Indeed, after three failed attempts to receive disability

17

benefits based upon the continuing problems with his prostate, plaintiff put forward no evidence that would support a finding that his condition had changed for the worse in the months leading up to the disability application pending before this court.

After considering the entire record, the court concludes that substantial evidence supports the ALJ's resolution of the conflicting medical evidence of record and plaintiff's testimony.  The ALJ attempted to further develop the record with respect to the continuing severity of plaintiff's prostatitis and accompanying symptoms.  Plaintiff to his own detriment, however, failed to attend the consultative examination that was scheduled or to make efforts to reschedule it.  This fact, along with the evidence recounted above, weighs against plaintiff's contention that the ALJ erroneously evaluated plaintiff's limitations as a result of prostatitis to be "not demonstrated" or not credible.

### II. Whether the ALJ Failed to Give Sufficient Weight to Plaintiff's Subjective Testimony about Pain

Plaintiff argues that the ALJ failed to give proper weight to his subjective complaints of pain from his prostatitis and accompanying symptoms. The standard for evaluating a claimant's subjective complaints, including pain, is set forth in the Social Security regulations. See Hartranft v. Apfel, 181 F.3d 358,362 (3d Cir. 1999). Once a claimant establishes a medical impairment that could reasonably be expected to produce the pain or other subjective symptoms alleged and which, taken with all other evidence, could lead to a conclusion of disability, the administrative law judge must assess the degree to which the claimant is accurately stating his or her subjective symptoms or the extent to which they are disabling.  Id.; see 20 C.F.R.§ 416.929.  In addition to medical evidence, the following factors may be considered in assessing the credibility of a

18

claimant's statements: (1) daily activities; (2)duration, location, frequency, and intensity of the

pain and other symptoms; (3) precipitating and aggravating factors; (4) medication taken to

alleviate pain or other symptoms; (5) treatment other than medication; (6) any other measures

used to relieve the symptoms; and (7) other factors concerning functional limitations or

limitations due to pain or other symptoms. 20 C.F. R. §416.929(c)(3)(i)-(vii).

The ALJ found that plaintiff's subjective complaints with regard to pain, precipitating

and aggravating factors, medications and other treatment, any functional restrictions and

plaintiff's daily life activities were not entirely credible (R. at 24.)  In reaching this conclusion,

the ALJ found that the objective medical record, plaintiff's description of his life style and

activities, the degree of medical treatment required, and discrepancies in plaintiff's assertions and

the documentary reports and medical history undermined giving full credit to his testimony.  (R.

at 24.)  There are numerous instances in plaintiff's medical records showing that he was either

seen by a doctor for symptoms associated with pain associated with his prostate problems or

complained of pain associated with his prostate when seeing a doctor for other reasons.   For

example, the records from plaintiff's visits to his urologist document his complaints over several

years of painful or difficult urination (dysuria), burning sensation and pressure during urination,

pain and burning during ejaculation, groin pain, rectal pain, and lower back pain.  (R. at 363-74;

601-24).  Plaintiff complained at times of constant pain and constant urgency to urinate.  (R. at

364).

"An administrative law judge may not ignore a claimant's subjective complaints and

reports of other symptoms... particularly where the claimant's registers such complaints not only

at the administrative hearing, but also during examinations by [the claimant's] physicians, as

reflected in his contemporaneous reports and notes." Dorf v. Bowen, 794 F.2d 896, 902 (3d Cir. 1986). Substantial evidence supports the ALJ's determination, however, that the medical evidence of record and plaintiff's own behavior did not wholly support crediting the full extent of plaintiff's subjective complaints of pain. The ALJ explained that upon considering plaintiff's subjective complaints with regard to pain, precipitating and aggravating factors, medications and other treatments, and functional restrictions on plaintiff's daily activities, he determined that the plaintiff's statements concerning his impairments and their impact on his ability to work were not entirely credible in light of his own description of his activities and lifestyle, the degree of medical treatment required, discrepancies in his assertions and information in the documentary reports, the medical history, the findings made upon examination, and the reports of reviewing, treating, and examining practitioners. (R. at 24.) The court must defer to the ALJ's credibility determinations unless they are not supported by substantial evidence. Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981). Here, because the ALJ properly evaluated plaintiff's subjective complaints of pain in light of the objective medical evidence, plaintiff's self-reported activities of daily living, and other criteria, the court will affirm the ALJ's determination that plaintiff's subjective complaints of pain were not wholly credible.

### III. Whether the ALJ Erroneously Relied on the Vocational Expert's Hypothetical Without Certain Limitations

"'[A] vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.'" Burns v. Barnhart, 312 F.3d at 123 (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)). A

20

hypothetical question posed to a vocational expert must include all of a claimant's impairments that are supported in the record.  Id.  At the hearing, the ALJ asked the vocational expert ("VE") about employment opportunities for plaintiff given a range of different criteria.  He was first asked if employment was available to some one like  plaintiff who was a younger individual with a GED who was precluded from performing all but sedentary work that entails no hazards, is unskilled, and low stress.  (R. at 152). The ALJ further defined that work as one and two-step processes, routine and repetitive tasks, primarily working with things rather than people, and entry level.  Id.  The VE opined that the type of work being described with those limitations at the sedentary level of exertion would include work as sorters and graders (100 local, 20,000 national), waxers of glass products (160 local, 66,000 national), assemblers (650 local, 149,000 national), and inspector/checkers (150 local, 37,000 national).  Id.  The VE further indicated that these jobs do not entail extremes of temperature.  Id.  The ALJ then told the VE that the plaintiff had testified that he required up to twenty bathroom visits per day and then asked if employers in the types of jobs described allow for unscheduled bathroom visits.  The VE answered in the negative:

> No they don't. . . . Normally you get two 15-minute breaks and the half-hour for lunch.  You  – most employers would give you one, maybe two other three to four minute breaks for the bathroom. But not ten.

(R. at 153).  The ALJ then asked the VE whether the described jobs would be precluded if plaintiff needed to lie down for one hour in the morning and one hour in the afternoon of a workday.  Id. The VE answered negatively and indicated that "[y]ou cannot lay down at any time in these jobs."  Id.  The ALJ then asked the VE whether the described jobs would be precluded if plaintiff could not stay on task one-third to two-thirds of the workday.  Id.  The VE answered that

the described jobs would be ruled out because "[y]ou have to be on task and functioning independently at least 85 to 90 percent of the workday to sustain these jobs."  Id.  At the hearing, plaintiff's counsel also noted for the record that the examiner's report indicated that plaintiff would have difficulty maintaining schedules and attending, and that plaintiff had a frequent need for restroom breaks.  (R. at 154).

The ALJ noted in his discussion of the hypothetical in his decision that "[w]hile it is further noted that if the claimant had further limitations as he has alleged resulting in him being substantially off task or requiring numerous breaks for bathroom visits or to lie down during the workday, these jobs would be negatively impacted, such limitations beyond those set for [sic] in the residual functional capacity determined above are not demonstrated."  (R. at 27).  Because this court found that substantial evidence supports the ALJ's finding that plaintiff's alleged physical limitations due to his prostatitis, in particular his need for frequent bathroom breaks, were not demonstrated to the extent alleged by plaintiff by the evidence of record, the ALJ did not err in relying upon the hypothetical that included only limitations found by the ALJ to be credibly demonstrated. Though in Ramirez v. Barnhart, 372 F.3d 546 (3d Cir. 2004), the court of appeals held that the administrative law judge's decision was not supported by substantial evidence when the administrative law judges's hypothetical question to the vocational expert failed accurately to convey all of claimant's impairments and limitations caused by those impairments, the ALJ here appropriately based the hypothetical upon only the limitations which he determined were supported by the medical evidence of record.

22

*IV.  Whether the ALJ Failed to Give Proper Consideration to Plaintiff's Limitations Resulting from his Adjustment Disorder and Dysthymic Disorder*

Plaintiff argues that the ALJ failed to give proper consideration to his limitations resulting from his adjustment disorder and dysthymic disorder.  Plaintiff principally relies on two consultative psychological examinations of plaintiff given by Dr. Provenzano at the request of the Social Security Administration, as well as documentation of plaintiff's diagnoses and clinical treatment notes, in support of a finding that plaintiff is disabled and does not have the residual functional capacity to perform an eight-hour workday.  Dr. Provenzano's October 4, 2001 report indicates that plaintiff suffers from dysthymic disorder along with his physical impairments. (R. at 279-85, 443-49.)  Dr. Provenzano further noted plaintiff's "psychological problems [are] secondary to his physical problems" and "[h]e is receiving appropriate treatment for his emotional problems."  (R. at 284).  Dr. Provenzano reported that plaintiff shows "some disturbances in activities of daily living but these are due to his physical problems" and "some disturbances in social functioning but this again is due to his problems with his prostatitis".  Id. Dr. Provenzano opined that plaintiff was "showing some mild disturbances in the area of concentration, persistence and pace" but was "capable of understanding simple to moderately complex instructions" though "he would have trouble sustaining a schedule because of his problems with his prostatitis, not because of problems with his mood."  Id.  Additionally, Dr. Provenzano noted that plaintiff probably would have difficulty with work stress and independent work, that "attendance might be a problem with him due to his pain,"that "persistence and pace would also be a problem in that he would need frequent rest breaks and bathroom breaks."  (R. at 284-85).   Dr. Provenzano's October 29, 1998 report diagnosed plaintiff with major depression,

recurrent, noted his prostate problems, and indicated that "[m]uch of his mental health status will be dependent upon his medical status."  (R. at 312-19.)  In addition, a letter written by plaintiff's treating clinical therapists at Chestnut Ridge Counseling Services, Inc., Adult Unit Therapist Robert Eby, Director of Adult Services James Olson, and Agency Psychiatrist Paul L. Conrad, on May 10, 1996 indicated that "[b]ased on the information available to us, it is our judgment that due to Mr. Daniels' current physical and mental impairments that he is unable to engage in any form of work activity. "  (R. at 308-309.)

Substantial evidence supports the ALJ's findings concerning plaintiff's psychological limitations and their effects on plaintiff's residual functional capacity.  The ALJ analyzed Dr. Provenzano's Report, considered the record evidence concerning plaintiff's suicide attempt, and reviewed plaintiff's treatment records in detail in his decision.  (R. at 19-21).  The ALJ considered plaintiff's functional ability in accordance with the Social Security Regulations, considering "B" criteria including plaintiff's "activities of daily living," "social functioning," "concentration, persistence, and pace," and "episodes of decompensation" and "C" criteria (R. at 22-24.)  The ALJ found that plaintiff's impairments were not medically established at listing level, and determined whether plaintiff retained residual functional capacity to work.  (R. at 24.)  To this end, concerning his mental impairments, the ALJ determined that plaintiff had counseling and medication therapy with reasonably good results. (R. at 25.)  In addition, the ALJ took into account plaintiff's global assessment of functioning ("GAF") score of 60 assessed in the consultative examination and found that the treating evidence established that plaintiff's mental

24

depression has been reasonably stable and relatively mild during the applicable period.  (R. at

26.)[12]  As explained in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994):

> The reporting of overall functioning … is done using the Global Assessment of
> Functioning (GAF) Scale.  The GAF Scale may be particularly useful in tracking
> the clinical progress of individuals in global terms, using a single measure.  The
> GAF Scale is to be rated with respect only to psychological, social, and
> occupational functioning.… In most instances, ratings on the GAF Scale should
> be for the current period (i.e., the level of functioning at the time of the
> evaluation) because ratings of current functioning will generally reflect the need
> for treatment or care.

Id. at 30.  A GAF score in the 51 to 60 range indicates moderate symptoms (e.g., flat affect and

circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or

school functioning (e.g., few friends, conflicts with peers or co-workers).  Id. at 34.

Substantial evidence supports the finding that plaintiff's mental depression was

reasonably stable and relatively mild during the applicable period.  In addition, the hypothetical

posed to the VE properly took into account the limitations that plaintiff may have due to his

mental and emotional impairments.  The ALJ asked the VE to consider  if employment was

available to some one like plaintiff who was precluded from performing all but sedentary work

that entails no hazards, is unskilled, and low stress.  (R. at 152). The ALJ further defined the

work as one and two-step processes, routine and repetitive tasks, primarily working with things

rather than people, and entry level.  Id.   Therefore, substantial evidence supports the ALJ's

findings with respect to plaintiff's limitations due to his dysthymic and adjustment disorders.

---

[12]  While the plaintiff was assessed to have a GAF of 35 during the period he was
hospitalized after his suicide attempt, (R. at 453.), he was assessed to have a GAF of 60 at the
time of the consultative exam.  (R. at 26.).

*Conclusion*

Based upon the evidence of record, the parties' arguments and supporting documents filed in support and opposition thereto, this court concludes that substantial evidence supports the ALJ's finding that plaintiff is not disabled.  The decision of the ALJ denying plaintiff's application for SSI is affirmed.

Therefore, plaintiff's motion for summary judgment (Docket No. 7) is **DENIED**, and defendant's motion for summary judgment (Docket No. 9) is **GRANTED**.

**IT IS ORDERED AND ADJUDGED** that judgement is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff, Michael Daniels.

The clerk shall mark this case as closed.

By the court:


 /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge


Dated:        March 24, 2006

cc:           Counsel of Record